**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Melin Flores, | No. CV-19-05293-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| DISH Network LLC, et al., | |
| Defendants. | |

Melin Flores was working for DISH Network when she began having back pain and missing days of work. The parties disagree on whether Flores' supervisor knew of her difficulties and whether he instructed Flores how to pursue options she might have under the Family Medical Leave Act of 1993 or the Americans with Disabilities Act of 1990. It is undisputed, however, that during an in-person meeting with her immediate supervisor and another supervisor, Flores was told she was being fired for excessive absences. According to one of the supervisors, during the meeting Flores tried to explain "something along the lines of being in the hospital for passing a kidney stone" and that she was "slated to go back to surgery or had to go back to the hospital, something along those lines." (Doc. 47-1 at 70). That supervisor concluded Flores' statements were sufficient to indicate Flores might need leave or other accommodations. Despite reaching that conclusion, the supervisor decided to proceed with the termination. (Doc. 47-1 at 70). Flores subsequently filed this suit, alleging FMLA and ADA claims.

The parties have filed cross-motions for summary judgment. There are many factual

disputes but there is undisputed evidence establishing DISH's liability under Flores' FMLA interference claim. Only DISH moved for summary judgment on the other claims and DISH's motion regarding those claims will be denied in large part. The parties will be required to brief whether Flores is entitled to summary judgment on some of her other claims. Finally, DISH's counsel will be required to establish their summary judgment arguments and factual positions had a good faith basis.

**BACKGROUND**

The parties' cross-motions for summary judgment require the Court view the facts differently depending on which motion is being resolved. Many of the facts, however, are undisputed. Unless otherwise indicated the following facts are undisputed.

As of June 2018, Flores was working for DISH in a customer service position. (Doc. 49 at 1). Flores was subject to DISH's "point-based attendance policy." (Doc. 49 at 2). Somewhat simplified, that policy awarded an employee one point if she had an unauthorized absence and ½ point if she arrived late or left early. (Doc. 49-3 at 39). An employee who accumulated eight points in a twelve-month period would be terminated. The policy did not award points for absences, late arrivals, or early departures related to FMLA leave or ADA accommodations.

If an employee was going to miss work or arrive late, she was required to call DISH's "attendance line." (Doc. 49 at 2). That line was described by Flores' direct supervisor Brandon Brown as the number an employee would call to inform DISH she was "not going to make it in, or whatever it may be, or [she is] going to be late." (Doc. 49-3 at 26). The attendance line employee would then "code it either late or absent." (Doc. 49-3 at 26). Regardless of what the employee said to the attendance line, the attendance line employee would not take any steps regarding a possible entitlement to leave. (Doc. 49-3 at 30). That is, if an employee provided information that indicated the employee might need FMLA leave or ADA accommodations, the attendance line employee would not take any action. Instead, it was up to the employee calling the attendance line to request to be

transferred to a manager to discuss possible leave or accommodations.  (Doc. 49-3 at 30).[1]

Instead of using the attendance line for situations where an employee might need leave or accommodations, DISH tried to funnel all such situations to what it describes as the "leaves line" or "leaves team."  The "leaves team" was reached through a telephone number or email address administered by individuals at DISH's corporate headquarters. (Doc. 49-3 at 47).  As explained by a DISH "senior human resources associate," DISH had an "open door policy" that allowed an employee in need of leave or an accommodation to speak with the individual she "felt most comfortable with."  (Doc. 49-3 at 49).  Thus, an employee could speak to a human resources representative, a "manager, supervisor, site leader, whoever they wanted to talk to to initiate the process."  (Doc. 49-3 at 50).  Once an employee spoke to such an individual, DISH's policy was for the employee to be told she "needed to explicitly contact the leaves team, whether that be via phone or via email, to initiate the process."  (Doc. 49-3 at 50).  When an employee contacted the leaves team, that team would work with the employee regarding submission of appropriate paperwork.  The leaves team would then determine whether the employee was entitled to leave or accommodations and, if needed, the leaves team would communicate the leave or accommodation requirements to the employee's supervisors.  (Doc. 49-3 at 51).

According to DISH, the leaves team was advertised "on numerous posters across the building," there was information about the team on a website the employees could access through their work computers, and there were business cards with information about the leaves team "throughout the entire [work] site."  (Doc. 49-3 at 56).  Employees were also told about the leaves team during their "new-hire training."  (Doc. 49-3 at 56).  Flores' supervisor claims he gave Flores a business card with information regarding the leaves team on two occasions.  (Doc. 49-3 at 13).  According to Flores, however, she was unaware

---

[1] Brown initially testified if an employee called the attendance line "and said they were in the hospital, usually those go over – [the attendance line] will transfer to a manager or someone in a different position to handle that type of situation."  (Doc. 49-3 at 27).  But during subsequent questioning, Brown clarified the burden was solely on the employee to request to speak to someone else if she needed leave.  Brown testified that when an employee calls and "it is a larger issue and they state that on the call . . . *and they ask to speak to someone about what they can do for attendance*, that's when they are transferred to someone else."  (Doc. 49-3 at 28) (emphasis added).

1    of the leaves team and the need to contact the leaves team if she needed leave or an

2    accommodation.  (Doc. 47-1 at 18).

3           For purposes of summary judgment, it is important to stress that DISH's human

4    resources employee described DISH's policies as allowing an employee to raise a leave or

5    accommodation issue with "whoever" she was most comfortable with.[2]  Accordingly, an

6    employee was free to raise the possible need for leave with, for example, her direct

7    supervisor.  Once she did, the direct supervisor was supposed to instruct the employee to

8    contact the leaves team.   Accordingly, while DISH formally processed leave or

9    accommodation requests through the leaves team, there is no evidence an employee raising

10   an issue with supervisory personnel was contrary to DISH policy.

11          The relevant facts regarding Flores' termination begin in November 2018.  At that

12   time, Flores was working four ten-hour shifts, Friday through Monday.  (Doc. 47-1 at 21).

13   At that time, Flores had already accumulated 6.5 points under the attendance policy.

14   Flores' 6.5 points was close to the eight-point threshold for termination.  (Doc. 49-3 at 80,

15   82).  In late November 2018, Flores began experiencing "intense back pain" but she

16   continued to work.  (Doc. 47-1 at 63).  Brown admitted during his deposition that he "knew

17   [Flores] was having something" and Flores "mentioned . . . something with" back pain.

18   But Brown did not "dive into what" the issue was.  (Doc. 47-1 at 55).  Flores continued to

19   work her assigned shifts in late November and early December.

20          Flores made a doctor's appointment for Thursday, December 13, a day Flores was

21   not scheduled to work.  (Doc. 47-1 at 6).  Flores claims her behavior at work around this

22   time made it obvious she was in significant pain.  Flores claims she was walking slowly,

23   had to sit down and stand up slowly, and had to wrap herself in a blanket.  (Doc. 49-2 at

24   79).  Flores' supervisors, however, do not recall ever seeing such behavior.

25          As of December 13, Flores' pain was so severe that she needed help from her mother

26

27   _____

     [2] The governing regulation requires an employee in need of leave "comply with the
28   employer's usual and customary notice and procedural requirements for requesting leave,
     absent unusual circumstances."   29 C.F.R. § 825.303(c).   While DISH formally
     administered leave requests through the leaves team, an employee was free to make an
     initial request with any supervisor.

or sister to get into a sitting or standing position.  (Doc. 47-1 at 8).  Flores could not drive due to the pain, so her mother drove her to the doctor's appointment.  (Doc. 47-1 at 63).  At the appointment Flores was diagnosed with a urinary tract infection and given antibiotics.  (Doc. 49-3 at 67).  Flores took the medication and felt slightly better.  Flores was scheduled to work on Friday, December 14th.  On the morning of the 14th, however, she was in too much pain to attend work.  (Doc. 47-1 at 7, 8).  Flores informed DISH she would not attend work and she remained in bed all day on the 14th.  (Doc. 47-1 at 10).  The pain improved enough the next day such that Flores was able to work her shift on Saturday, December 15th.

According to Flores, while at work on the 15th Brown asked her if she was feeling better.  She told him "Yes, I'm feeling better."  (Doc. 47-1 at 12).  Flores also claims she and Brown had a separate conversation where she told him "it was going to be probably my kidney."  (Doc. 47-1 at 12).  Brown allegedly responded that "he might have had or one of his family might have had an issue with the kidney" and he agreed kidney issues could be painful.  (Doc. 47-1 at 13).  Brown agrees he might have asked Flores if she was feeling better but he does not remember the specifics of the conversation.  (Doc. 47-1 at 55).  Flores worked her full shift on the 15th and the following day, Sunday, December 16th.  (Doc. 49-2 at 45).

Flores was scheduled to work on Monday, December 17th.  She woke up that day in pain, although the pain had shifted locations.  (Doc. 49-2 at 47).  Flores called her doctor and was told to come in for another appointment and, if necessary, she would be referred to a hospital.  Flores then called the attendance line at DISH.  The only evidence regarding what Flores told the attendance line comes from Flores.  According to Flores, she told the attendance line: "I was sick, that I was being sick, that I went to the doctor already, that they gave me medication but I still have pain. . . . I was advised to go in for more tests, and possible [sic], you know, referred to the hospital."  (Doc. 49-2 at 48).  The attendance line employee told Flores he would mark her down as unable to work the entire day but if she "was able to go on in to work, then that's fine, and [Flores should] just let know [sic] the

manager in charge what was happening." (Doc. 49-2 at 49). Flores missed the entire day of work on the 17th. That absence brought her "attendance point" total to 8.5, above the 8-point threshold for termination. At Flores' medical appointment on December 17th, she was diagnosed with an ongoing urinary tract infection and given additional medication. (Doc. 49-2 at 57).

Flores was not scheduled to work December 18th through the 20th. During her time off, however, Flores remained in significant pain. Flores testified that, from December 17-20, she was confined to her bed. The relevant deposition testimony is as follows:

> **Question**: Is there any activities that you believe you were unable to do because of your medical condition that you had at that time? I know it got worse later, but at that time in that week.
>
> **Flores**: In that week? I mean, I wasn't feeling well. That's the main reason that I went to the doctor. And I stayed in bed the days that I was – you know, they were my days off, to make sure that I have the actual energy to go back on – on Friday.
>
> Because, like I said before, like, it was, like, I would get up and then walk, and then my thing about I was exhausted like it wasn't – and then the pain. So it's a draining situation that I had going on that I –

(Doc. 49-2 at 76).[3] Defense counsel then asked follow-up questions regarding the extent of Flores' limitations that week:

> **Question**: Was there anything, as you sit here today, that you were unable to do because of either [pain or fatigue]?
>
> **Flores**: I'm not sure I'm not understanding the question. Not do as in?
>
> **Question**: Well, any activities? For example, you know, you said you could shower, you could bathe yourself?
>
> **Flores**: Yes.
>
> **Question**: Were there any activities like that that you could not

---

[3] The parties have identified this deposition testimony as addressing a period before December 13th. (Doc. 46 at 5; Doc. 52 at 3). But the testimony makes clear Flores is describing the period from December 17-20. The deposition describes Flores visiting a doctor on "Monday," which must have been December 17th as Flores' other medical appointment was on Thursday, December 13th. Counsel then asked Flores about her pain "at that time in that week" to which Flores responded about her need to stay in bed to prepare for work on Friday. (Doc. 49-2 at 75-76).

do?

**Flores**: Other than the normal taking care of myself, it was – that's about it what I could do.  Nothing else.

**Question**: You made your own food?

**Flores**: It was actually my mom.  I would get out and, you know, grab the food and then eat, but to the point that me actually making the food, I couldn't get through the whole process.

**Question**: Okay.  And that was in that week?

**Flores**: That was in – yes.

While Flores was off, Brown sent an email to the leaves team, inquiring whether Flores had any pending requests.  (Doc. 49-3 at 85).  The leaves team responded Flores had no "pending or approved claims."  (Doc. 49-3 at 85).  Brown then informed the leaves team Flores did not work until the 21st but he would "process the term[ination] for her on this date."  (Doc. 49-3 at 85).

On December 21st, Flores arrived at work.  According to her, she had interpreted the statements by the attendance line on the 17th about speaking to a manager to mean she should speak to a manager about her medical issues when she returned to work.  Thus, on December 21st Flores brought to work her "doctor's documents . . . to show them . . . so [DISH] could know that I wasn't missing work just to miss work, that I was missing work because I was going through all that."  (Doc. 47-1 at 25).  Before speaking with a manager, Flores "worked a couple hours."  Brown then summoned her to a meeting.  (Doc. 47-1 at 25).  The meeting was with Flores, Brown, and Brown's supervisor Diana Angulo.  (Doc. 49-3 at 22).  Brown began by going "through the attendance record and the attendance policy guidelines."  (Doc. 47-1 at 68).  Brown then stated "effective immediately, we're terminating your employment."

During her deposition, Angulo described the following regarding Flores' reaction to Brown's statement:

I remember her getting emotional and discussing some of the health issues that she was dealing with.  I remember she said something along the lines of being in the hospital for passing a

kidney stone. I did a quick pulse check naturally, me being, you know, concerned over someone's health and the fact that she was back to work. I said, are you – I'm sorry to hear that, you know. I hope you're feeling better now. Are you okay?

She shared with me that she was, I think, slated to go back to surgery or had to go back to the hospital along those lines. And I probably concluded the conversation with saying, you know, at this point, we have already reviewed your entire attendance record. We have nothing to fall back on. At this point, we're going to be separating employment.

(Doc. 47-1 at 70). After providing that description, Angulo was asked the following regarding Flores' possible entitlement to leave or other accommodations:

**Question**: In that conversation, she did tell you she was going to have to go back to the hospital; is that right?

**Angulo**: I believe she did say that, yes.

**Question**: At any point during your conversation with the termination, did you think that she might qualify for leave?

**Angulo**: The only thing that I can say there is that what she had shared at the table at the time of termination would have potentially qualified for a leave – I don't know for certain – if she would have followed the right protocol. I went into the termination knowing that there was no attempt to try to approve those absences through a certification.

(Doc. 47-1 at 71-72).

It is undisputed that, at some point during this meeting, Flores presented some of her medical records to Angulo. (Doc. 47-1 at 58). When asked what would have happened if Flores had presented those records to Brown earlier, he stated he "could have given it to HR" to see if they could avoid terminating her. (Doc. 47-1 at 59-60). It is further undisputed that if Flores' absence on December 17th had been approved, she would not have been terminated. (Doc. 47-1 at 67).

After she was terminated, Flores continued to seek medical care for her pain. Approximately two weeks later, on January 5, 2019, Flores was diagnosed with a renal cyst. (Doc. 47-1 at 42). From January 13, 2019 through January 30, 2019, Flores was hospitalized and treated for the cyst and other conditions, including "severe sepsis." (Doc. 47-1 at 51). As described in her medical records, as of January 13th, Flores' condition was

so severe that she had a "high probability of imminent or life threatening deterioration." (Doc. 47-1 at 51).  Flores recovered, however, and eventually filed the present suit.

Flores is pursuing claims which she identifies as: 1) FMLA Interference; 2) FMLA Retaliation; and 3) ADA Violations.  (Doc. 1-1 at 21-22).  Flores now seeks summary judgment only on her first claim of "FMLA Interference."  (Doc. 46).  DISH seeks summary judgment on all claims.

ANALYSIS

## I.   FMLA Interference

A claim of FMLA interference requires an employee establish five elements: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014).  The parties agree the first two elements are met but they disagree on the remaining three.  Viewing the facts in the light most favorable to DISH, Flores is entitled to summary judgment.

### A.  Entitlement to Leave

The first disputed element is whether Flores was "entitled to leave under the FMLA."  *Id.*  Under the FMLA's statutory text, an employee is entitled to FMLA leave if "a serious health condition . . . makes the employee unable to perform the functions of [her] position."  29 U.S.C. § 2612(a)(1)(D).  This entitlement can be broken down into discrete requirements that an employee have a "serious health condition" that makes her "unable to perform" her position.  The evidence viewed in the light most favorable to DISH establishes Flores meets both requirements.

#### i.   Serious Health Condition

The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  The relevant regulation explains a "serious health condition involving continuing treatment by a health care provider" includes "[a] period of

incapacity of more than three consecutive, full calendar days . . . that also involves . . . [t]reatment two or more times, within 30 days of the first day of incapacity."  29 C.F.R. § 825.115(a).  The regulation defines incapacity as the "inability to work, attend school or perform other regular daily activities due to the serious health condition."  29 C.F.R. § 825.113(b).  For purposes of the present case, these provisions can be combined such that an employee has a qualifying "serious health condition" if she was unable to perform "regular daily activities" for a period of three consecutive days and she received medical treatment at least twice in a 30-day period.

It is undisputed Flores initially received medical care for her pain on December 13th and she received additional medical care on December 17th.  Thus, she received medical treatment the requisite two times within a 30-day period.  Next, Flores experienced a four-day period of "incapacity" from December 17th through December 20th.  Flores was too sick to work on Monday, December 17th.  (Doc. 49-2 at 47-48).  From December 17-20, Flores "wasn't feeling well" and, as she testified to in her deposition, "I stayed in bed the days that I was – you know, they were my days off, to make sure that I have the actual energy to go back on – on Friday."  (Doc. 49-2 at 76).  Flores also testified that she was unable to prepare her own food.  Being confined to one's bed and unable to prepare food establish an inability to perform regular daily activities.  Accordingly, the evidence viewed in the light most favorable to DISH, establishes Flores had a "serious health condition."

DISH disagrees and argues Flores' "did not have a serious health condition" prior to her termination on December 21st.  (Doc. 48 at 6).  DISH claims that during the last month of her employment, Flores' "only medical condition . . . was a UTI, which resolved after a course of antibiotics."  (Doc. 48 at 6).  DISH explains Flores' UTI was "inconvenient and even painful," but it "was not a serious health condition under the FMLA."  (Doc. 48 at 7).  DISH goes so far as to claim Flores' UTI "did not incapacitate her in any way" while she was employed at DISH.  (Doc. 48 at 6).  These arguments are directly contradicted by the record.

The initial problem with DISH's position is the insistence that Flores' only medical

condition in November and December 2018 was a UTI.  It is true the only condition diagnosed at that time was a UTI.  However, DISH does not establish why the Court, *as a matter of law*, must ignore subsequent events that might indicate Flores was suffering from something beyond a simple UTI.  Flores began experiencing pain in November 2018.  In early December, she was diagnosed as having a UTI.  She did not experience much relief but that remained the only diagnosis after her second medical appointment on December 17th.  Flores was terminated on December 21st.  Flores then continued to have pain and, approximately two weeks later, she was diagnosed with a renal cyst and hospitalized for two weeks.  Claiming Flores' initial diagnoses must have been correct, and she only had an UTI at the relevant time, is possible.  But it is not an undisputed possibility.  By seeking summary judgment, DISH somehow concluded the evidence, viewed in the light most favorable to Flores, established her medical condition in December necessarily was a minor ailment.  That was not a legitimate basis for seeking summary judgment.  *See, e.g.*, *Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 677 (8th Cir. 2000) ("The employer who precipitously fires an employee, when the latter claims the benefits of leave under FMLA, bears the risk that the health condition in question later develops into a serious health condition within the meaning of [the applicable regulation].").

The more basic problem with DISH's position is the assumption that a UTI, per se, cannot qualify as a "serious health condition."  DISH cites no authority and it is obviously incorrect.  For purposes of determining if Flores had a qualifying medical condition under the FMLA, the relevant inquiry is not the exact diagnosis Flores had at a particular moment in time.  Rather, the inquiry depends on the limitations Flores was experiencing.[4]  Under DISH's approach, if an employee were initially diagnosed with a "common cold" that would necessarily prevent the employee from qualifying for FMLA leave.  Even if the initial diagnosis was later deemed incorrect and the true diagnosis was far more serious, DISH believes the employee would not be entitled to FMLA benefits.  The FMLA does

---

[4] This is illustrated by the relevant regulation stating an individual can obtain FMLA leave to obtain "examinations to determine if a serious health condition exists."  29 C.F.R. § 825.113(c).  In other words, an employee can take advantage of FMLA leave before she even has a formal medical diagnosis.

not operate in such a bizarre fashion. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 163 (1st Cir. 1998) (discussing FMLA and concluding it was "unlikely that Congress intended to punish people who are unlucky enough to develop new diseases, or to suffer serious symptoms for some period of time before the medical profession is able to diagnose the cause of the problem"); *Johnson v. Benton Cty. Sch. Dist.*, 2013 WL 12180097, at *9 (N.D. Miss. Feb. 21, 2013) ("The FMLA protects employees suffering from serious medical conditions, not merely those with a clear and certain prognosis.").

DISH's support for its diagnosis-only view of the FMLA's "serious health condition" requirement relies on a misleading citation of the governing regulation. According to DISH, 29 C.F.R. § 825.113(d) states "the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave." (Doc. 48 at 7). But DISH deleted the crucial introductory phrase to that list of ailments. The regulation begins "[o]rdinarily, unless complications arise," the common cold and the other listed conditions will not qualify as serious health conditions. 29 C.F.R. § 825.113(d). Thus, the regulation does not mean someone who contracts a common cold, but lapses into a coma, is categorically ineligible for FMLA benefits. Rather, the regulation focuses on an individual's medical condition, regardless of formal diagnosis, which must control.

Beyond its misguided focus on Flores' formal diagnosis, DISH also contends Flores was never "incapacitated" as required by the regulations. This argument, however, is based on misrepresentations of the record and governing law that require a detailed explanation.

According to DISH, "[w]hile [Flores] chose not to report to work following her doctor's visit on December 17, 2018, she admits she was fully capable of working on that day and intended to report to work after her doctor's visit. SOF 25." (Doc. 48 at 6). Paragraph 25 in DISH's Statement of Facts states, in relevant part,

> Flores believed she would be reporting for work later that day and did not tell the attendance line she was unable to work. Exhibit A, 125:18-126:10. Ultimately, Flores chose not to report to work. Exhibit A, 173:7-12.

(Doc. 49 at 5).  The immediate difficulty for DISH is that their motion says Flores "admits she was fully capable of working" on December 17th but DISH's Statement of Facts does not include that assertion.  The more important aspect, however, is that the portions of Flores' deposition referenced in the Statement of Facts do not include a statement by Flores that "she was fully capable of working."  Instead, the cited portions of Flores' deposition merely state Flores expected she would be able to work.

Not content on making a misrepresentation regarding Flores' condition on December 17th, DISH then argues "during [Flores'] days off between December 18-20, Flores was fully able to care for herself and perform her regular daily activities (SOF 27) and again reported to duty on December 21, 2018, ready and able to work her full shift." (Doc. 48 at 7).  The cited portion of the Statement of Facts states

> During her days off, Flores was able to get out of bed, shower, and care for herself.  Exhibit A, 173:12-21.  Flores reported to work as scheduled on Friday, December 21, 2018, expecting to work a full day.  Exhibit A, 173:22-174:3.

(Doc. 49 at 6).  Again, the motion makes the bold inaccurate statement that Flores was "fully able to care for herself and perform her regular daily activities" from December 18th through December 20th.  But the cited deposition testimony says no such thing.

It is true that Flores testified she was able to get out of bed, care for herself, and shower from December 17th through December 20th.  (Doc. 49-2 at 75).  But seconds after giving that testimony, Flores testified she stayed in bed for those four days "to make sure [she had] the actual energy" to work on Friday.  DISH's counsel then sought clarification and Flores stated, during that week, she could perform basic tasks of self-care such as showering but "[n]othing else."  (Doc. 47-1 at 23).  When asked if she made her own food during those days, Flores responded:

> It was actually my mom.  I would get out and, you know, grab the food and then eat, but to the point that me actually making the food, I couldn't get through the whole process.

(Doc. 47-1 at 23).  So, to be clear, DISH's motion argues Flores was "fully able to care for herself and perform her regular daily activities" from December 17th through December

20th, but Flores' deposition states she was effectively bedbound those days, able to perform basic self-care tasks and "nothing else." Flores could not even her own meals. The Court questions how DISH's counsel could argue, in good faith, that Flores was "fully able to care for herself and perform her regular daily activities" in light of Flores' deposition testimony.

Finally, DISH argues "Flores' self-serving testimony, standing alone, is insufficient to prove incapacity under the FMLA." (Doc. 52 at 4). DISH then provides a string citation of cases from the District of Nevada, the District of Oregon, the Third, Sixth, Seventh,[5] and Eighth Circuits. (Doc. 52 at 4). Notably missing from DISH's list of citations is the Ninth Circuit authority that controls. And assuming DISH's counsel read the cases they cite, it is impossible to conclude they were unaware of the governing Ninth Circuit authority.[6]

In 1999, the Ninth Circuit addressed an FMLA dispute where an individual had been assaulted by several of his friends. *Marchisheck v. San Mateo County*, 199 F.3d 1068, 1071 (9th Cir. 1999). There were medical records showing the injuries from that assault were relatively minor. *Id.* But there was also a declaration from the individual saying his injuries meant he "could not do anything for four or five days." *Id.* at 1074. The Ninth

---

[5] DISH cites *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591 (7th Cir. 2008) as "holding that some medical evidence is necessary to establish a serious health condition." (Doc. 52 at 4). That is an accurate statement regarding the holding in *Caskey* but it is irrelevant to the precise issue of "incapacity." As the Seventh Circuit subsequently noted, under the FMLA "'incapacity' and 'serious health condition' are interrelated" but "they are not interchangeable terms." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). Therefore, *Caskey* "stand[s] for the unsurprising proposition that a plaintiff needs some medical evidence to establish a serious health condition." *Id.* at 838. But "incapacity can be established by lay testimony and expert medical testimony is *not* required to prove the incapacity." *Id.*

[6] Because there is binding Ninth Circuit authority the Court need not discuss the authority from the Districts of Nevada and Oregon in detail. However, the District of Nevada case involved testimony from the plaintiff alleging he was entitled to FMLA leave due to anxiety. However, that employee "stated in his deposition that he could still do his job and reach his goals despite his anxiety." *Nagy v. W. All. Bank*, No. 216CV2095JCMGWF, 2018 WL 3094874, at *5 (D. Nev. June 22, 2018). In fact, the plaintiff had not identified *any* period of incapacity. *Id.* at *4 n.2. As for the District of Oregon case, the plaintiff admitted "she was not incapacitated for more than three days until . . . one week after she was terminated." *Nelson v. Fiskars Brands, Inc.*, No. 03:14-CV-00685-SB, 2015 WL 5566454, at *12 (D. Or. Sept. 13, 2015). Neither of these cases is of any use to the present situation.

Circuit explained the parties disagreed on whether the injuries "incapacitated" the individual as contemplated by the FMLA regulations.  *Id.*  In the Ninth Circuit's view, the individual's declaration was sufficient to "create[] a disputed issue of fact and precludes summary judgment on the issue of 'incapacity.'"  *Id.*  Accordingly, in the Ninth Circuit, lay testimony on its own can be sufficient to establish "incapacity" under the FMLA.

DISH does not cite *Marchisheck*.  Instead, DISH cites a Third Circuit case, *i.e. Schaar v. Lehigh Valley Health Services, Inc.*, 598 F.3d 156 (3d Cir. 2010).  DISH claims that case concluded "some medical evidence is necessary to show the incapacitation was 'due to' the serious health condition."  (Doc. 52 at 4).  DISH is correct the Third Circuit concluded an employee can only "satisfy her burden of proving three days of incapacitation through a combination of expert medical and lay testimony."  *Id.*  Accordingly, in the Third Circuit, if an employee does not offer medical testimony that the employee was incapacitated, the claim fails as a matter of law.  *Id.*  In reaching this rule, however, the Third Circuit explicitly noted it was adopting a different rule from the Ninth Circuit.  The Third Circuit explained the Ninth Circuit had already held "that lay testimony is sufficient, by itself, to establish incapacitation."  *Id.* at 160.  The Third Circuit then said it was adopting a different rule: "Contrary to the . . . Ninth Circuit[], however, we do not find lay testimony, by itself, sufficient to create a genuine issue of material fact."  *Id.* at 161.

Given that *Schaar* explicitly discusses *Marchisheck* and DISH's counsel cites *Schaar*, the Court can only conclude counsel must have been aware of *Marchisheck*. Yet counsel chose not to cite *Marchisheck*.  As set out in more detail later, DISH's counsel will be required to establish a good faith basis for citing *Schaar* without alerting the Court that *Marchisheck* controlled.

In any event, under Ninth Circuit law, lay testimony is sufficient to establish incapacitation.  Flores testified she was incapacitated from December 17th through December 20th.  DISH has not pointed to any evidence Flores was not, in fact, incapacitated during that time period.  Thus, Flores is entitled to summary judgment on the issue of incapacitation and, more generally, Flores is entitled to summary judgment that

1    she had a "serious health condition" as contemplated by the FMLA during the last week of

2    her employment with DISH.

3                    ii.    **Unable to Perform Functions**

4            To be entitled to FMLA leave, a "serious health condition" is not enough.   The

5    medical condition must have rendered the employee "unable to perform the functions of

6    [her] position."   29 U.S.C. § 2612(a)(1)(D).   The governing regulation states "[a]n

7    employee is unable to perform the functions of the position where the health care provider

8    finds that the employee is unable to work at all or is unable to perform any one of the

9    essential functions of the employee's position within the meaning of the Americans With

10   Disabilities Act."  29 C.F.R. § 825.123(a).

11           The parties have not focused on this requirement and, based on the finding that

12   Flores was unable to perform her regular daily activities from December 17th through 20th,

13   the obvious conclusion is that she was "unable to perform the functions of [her] position"

14   during that time.  29 U.S.C. § 2612(a)(1)(D).  But the regulation speaks of a "find[ing]" by

15   the employee's health care provider.  29 C.F.R. § 825.123(a).  Flores has not submitted

16   such a finding.  It appears, however, the regulation's requirement of a medical finding is

17   referencing a different situation than what is presented here.

18           Under the FMLA, an "employer may . . . require that the employee obtain, in a

19   timely manner, a written certification by a health care provider regarding the medical

20   condition necessitating leave."  *Bailey v. Sw. Gas Co.*, 275 F.3d 1181, 1185-86 (9th Cir.

21   2002) (citing 29 U.S.C. § 2613(a)).   An employer could, of course, "take the employee at

22   his word and grant the [FMLA] request" without requiring a certification.   *Hansen v.*

23   *Fincantieri Marine Group, LLC*, 763 F.3d 832, 837 (7th Cir. 2014).  When an employer

24   has not required an employee produce a medical certification, the employee would have no

25   reason to seek out a "find[ing]" that she was unable to perform the functions of her position.

26   Thus, as explained by the Eighth Circuit, if an employer chooses to forgo its right to obtain

27   a medical certification, it should not be allowed to later claim there is no medical

28   certification.  *Thorson v. Gemini, Inc.*, 205 F.3d 370, 382 (8th Cir. 2000).  Based on the

sequence of events in this case, requiring Flores now produce a medical certification regarding her period of incapacity would not be appropriate.

On December 21st Flores informed DISH of her medical issues.  In response, DISH could have required Flores submit a medical certification.  But DISH chose not to do so. Instead, DISH terminated Flores.  Thus, Flores never had any need to obtain a "find[ing]" from her medical provider regarding her ability to work on December 17th or earlier.  29 C.F.R. § 825.123(a).  Moreover, the undisputed evidence establishes Flores was unable to perform her regular daily activities from December 17th through 20th.  During those days Flores was bedbound and able to complete only the most basic of self-care tasks.  There is no evidence Flores could have worked at all during those days.  When the employer does not request a medical certification, and there is undisputed evidence the employee was incapacitated, the regulation's requirement of a medical finding is not applicable.  There is no genuine dispute of material fact that Flores met the statutory requirement of being "unable to perform the functions of [her] position."  This conclusion, together with Flores having a "serious health condition," means Flores has established the first element of her FMLA interference claim that she was "entitled to leave under the FMLA."  *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014).

## B.  Sufficient Notice of Intent to Take Leave

The next element of Flores' FMLA interference claim is that she provided "sufficient notice of [her] intent to take leave."  *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014).  As explained in the regulation, this element requires an employee "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. § 825.303(b).  Depending on the facts, "such information may include that a condition renders the employee unable to perform the functions of the job."  *Id.*  But "[w]hen an employee seeks leave for the first time for a FMLA–qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."  *Id.*  The regulation recognizes merely "[c]alling in 'sick' without providing more information will not be considered sufficient notice to

1    trigger an employer's obligations."  29 C.F.R. § 825.303(b).  But employers cannot avoid

2    liability through willful blindness.

3            The Ninth Circuit has ruled "[e]mployees need only notify their employers that they

4    will be absent under circumstances which indicate that the FMLA might apply."  *Bachelder*

5    *v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001).  In addition, "[i]t is the

6    employer's responsibility to determine when FMLA leave is appropriate, to inquire as to

7    specific facts to make that determination, and to inform the employee of his or her

8    entitlements."  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1134 (9th Cir. 2003).  When

9    assessing the adequacy of information provided by an employee, "the critical question is

10   whether the information imparted to the employer is sufficient to reasonably apprise it of

11   the employee's request to take time off for a serious health condition."  *Mora v. Chem-*

12   *Tronics, Inc.*, 16 F. Supp. 2d 1192, 1209 (S.D. Cal. 1998) (quoting *Manuel v. Westlake*

13   *Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).

14           DISH's arguments regarding the adequacy of Flores' notice are, like so many other

15   aspects of DISH's filings, lacking factual and legal support.  There are disputes of fact

16   about many of the forms of notice Flores tries to invoke.  Thus, Flores claims that in

17   November and December 2018, she had to walk very slowly, sleep on her breaks, wrap

18   herself in a blanket, and could only sit or stand slowly.  No supervisory employee at DISH

19   admits to seeing this behavior, meaning there might be a dispute of fact if this were the

20   only notice at issue.  Similarly, Flores claims she informed Brown that she might be having

21   kidney issues and while Brown does not recall such a conversation it is a disputed fact.

22   Again, if that were the only instance of alleged notice, trial would be necessary.  But there

23   is other evidence of notice DISH cannot avoid.

24           On December 17th, Flores called the attendance line and stated: "I was sick, that I

25   was being sick, that I went to the doctor already, that they gave me medication but I still

26   have pain. . . . I was advised to go in for more tests, and possible, you know, referred to the

27   hospital." (Doc. 49-2 at 48).  An employee that informs her employer she is sick, is going

28   for tests, and might be sent to the hospital approaches sufficient notice that FMLA leave

might be needed.  *Cf. Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1131 (9th Cir. 2001) (holding "two doctor's notes" an employee provided were sufficient to place the employer "on notice that the leave might be covered by the FMLA").  The notice to DISH's attendance line, however, is not why Flores is entitled to summary judgment on this point. The crucial notice was what occurred on December 21st.

Flores reported to work on December 21st expecting to provide medical records to DISH to explain her recent absences.  Before she had a chance to do so, she was called to a meeting with Brown and Angulo.  After being informed she was going to be terminated based on her recent absences, Flores became upset and tried to explain "some of the health issues that she was dealing with."  According to Angulo, Flores stated "something along the lines of being in the hospital for passing a kidney stone," and she was "slated to go back to surgery or had to go back to the hospital."  Flores attempted to offer her medical records to support these statements.  At that time, it is undisputed Angulo *knew* "what [Flores] had shared at the table at the time of termination would have potentially qualified for a leave."  Despite that knowledge, Brown and Angulo proceeded with the termination. These facts present an obvious case of sufficient notice.  When an employee provides information that leads a supervisor to conclude the FMLA might be at issue, it is hard to see how an employer can later claim insufficient notice.  DISH, however, makes precisely that argument.  And that argument may be sanctionable.

According to DISH, "[t]he information Flores provided DISH" at the December 21st meeting "was substantively insufficient to reasonably put DISH on notice she suffered a serious health condition."  (Doc. 57 at 6).  DISH further claims "[n]o reasonable juror could conclude Flores adequately notified DISH she was or would be absent under circumstances indicating the FMLA might apply."  (Doc. 57 at 7).  Under governing law, it is unclear how DISH's counsel could make these assertions.

To recap, on December 21st, Flores told Brown (her direct supervisor) and Angulo (Brown's supervisor) that she was having medical difficulties with her kidney, she was planning to go in for surgery or, at the very least, to return to the hospital.  Upon hearing

this information, Angulo concluded Flores "potentially qualified for a leave."  But DISH now claims "no reasonable juror" could draw the exact conclusion Angulo drew.  DISH's position appears to be based on a refusal to even acknowledge Angulo's deposition.  That is, DISH does not address Angulo's deposition testimony in making its arguments.  Therefore, the Court is left to conclude DISH has no explanation why Angulo's own conclusion must be ignored.  But even if Angulo had not admitted she knew the FMLA might be implicated, Flores' statements at the December 21st meeting were *obviously* sufficient notice of possible need for leave.

At the December 21st meeting Flores informed DISH supervisory personnel she was experiencing ongoing kidney issues, those issues were causing Flores to miss work, and the issues were sufficiently serious that Flores might require surgery or hospitalization.  That information easily qualifies as "circumstances which indicate that the FMLA might apply."  *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001).  As a matter of law, Flores provided sufficient notice prior to her termination.[7]

### C. FMLA Entitlement

The final disputed element of Flores' FMLA interference claim is that DISH denied her FMLA benefits to which she was entitled.  *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014).  There is no dispute this element is met.  The relevant regulation explains FMLA leave cannot "be counted under no fault attendance policies."  29 C.F.R. § 825.220(c).  And the Ninth Circuit has held the FMLA "protect[s] an employee against disciplinary action based on her absences if those absences are taken for one of the Act's enumerated reasons."  *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001).

---

[7] DISH does not argue Flores provided the information to Brown and Angulo on December 21st only after she was no longer an employee.  Thus, even viewed in the light most favorable to DISH, the information was provided at a time Flores was still an employee.  *Cf. Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 967 (9th Cir. 2011) (holding individual who was not an employee at the time he made his request could not "invoke FMLA protection").

Had DISH performed its obligations under the FMLA, Flores' absence on December 17th would have been excused and would not have counted towards her point total.  In other words, Flores's absence on December 17th was due to one of the FMLA's enumerated reasons and DISH could not use the absence in its termination decision.  DISH based its termination decision on that absence.  Therefore, DISH denied Flores FMLA benefits to which she was entitled.

### D.  Damages

Flores is entitled to summary judgment on liability regarding her FMLA interference claim but she did not seek summary judgment regarding the amount of her damages.  The correct amount, therefore, must be determined at trial.  *See Farrell v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 530 F.3d 1023, 1025 (9th Cir. 2008) ("It is well-settled that the FMLA, by its terms, only provides for compensatory damages and not punitive damages.").

## II.    Remaining Claims

In addition to her claim for FMLA interference, Flores also has an FMLA retaliation claim, a discrimination claim under the Americans with Disabilities Act, and a retaliation claim under the ADA.  DISH moved for summary judgment on these claims but Flores did not.  Viewed in the light most favorable to Flores, DISH is entitled to summary judgment on the FMLA retaliation claim.  DISH is not, however, entitled to summary judgment on the ADA claims.  The parties will be required to confer and submit a joint statement indicating whether they agree the ADA claims must go to trial or if Flores now wishes to seek summary judgment on those claims.

### A.  FMLA Retaliation

An FMLA retaliation claim operates in a more limited manner than its name implies. As explained by the Ninth Circuit, the FMLA's anti-retaliation provision does "not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under" a claim for FMLA interference. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001).  Thus, an FMLA retaliation claim

"applies only to employees who *oppose* employer practices made unlawful by FMLA." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 n.7 (9th Cir. 2003).  "[F]or example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave," and the employee then suffers an adverse action, the employee could bring an FMLA retaliation claim. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012).  *See also Browett v. City of Reno*, 237 F. Supp. 3d 1040, 1046 (D. Nev. 2017) (FMLA retaliation claim must be premised on employer's actions "in response to complaints about unlawful practices").

Here, Flores has not pointed to the protected activity she took that would be cognizable under an FMLA retaliation theory.  That is, Flores does not point to any evidence that she opposed DISH policies that were unlawful under the FMLA. *Xin Liu*, 347 F.3d at 1133 n.7.  Flores' opposition explains that requesting FMLA leave should be deemed a protected activity.  (Doc. 54 at 17.)  That is correct but it does not help Flores for purposes of her retaliation claim.  Flores' request for FMLA leave, followed by her termination, supports her FMLA interference claim, not her FMLA retaliation claim.  Accordingly, DISH is entitled to summary judgment on the FMLA retaliation claim.

## B.  ADA Claims

Flores asserts "discrimination" and "retaliation" claims under the ADA.  Both of these claims can be analyzed using "the burden-shifting framework outlined in *McDonnell Douglas*."  *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014).  Viewed in the light most favorable to Flores, the record establishes genuine disputes of fact regarding both claims.

There are two types of ADA "discrimination" claims Flores may be pursuing.  First, Flores may be pursuing a "disparate treatment" claim.  Second, Flores may be pursuing a "failure to accommodate" claim.  These two claims are "analytically distinct." *Johnson v. Bd. of Trustees of Boundary Cty. Sch. Dist. No. 101*, 666 F.3d 561, 567 (9th Cir. 2011); *Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 798 (9th Cir. 2017) (same).  But in situations such as the present, "from a practical standpoint" they are "the same." *Humphrey*

*v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001). That similarity is because DISH's alleged failure to accommodate resulted in disparate treatment, *i.e.* an allegedly wrongful termination. *Id.* While they appear to overlap, the Court will analyze them separately.

### i.  ADA Disparate Treatment

To survive summary judgment on the disparate treatment claim using the *McDonnell Douglas* regime, Flores must first show she was "a disabled person within the meaning of the [ADA]," she was "a qualified individual with a disability," and she "suffered an adverse employment action because of [her] disability." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001). If Flores makes such a showing, DISH must then offer "a legitimate, nondiscriminatory . . . reason for the adverse employment action." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). Finally, Flores would have to show the proffered reason was pretext. *Id.*

According to DISH, Flores cannot establish the very first requirement of showing she was "disabled within the meaning of the ADA while employed by DISH." (Doc. 48 at 9). By statute, an individual is "disabled" if she has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). DISH claims Flores' pain did not "substantially limit a major life activity at any time prior to her termination." (Doc. 48 at 9). But as made clear earlier, and especially when viewed in the light most favorable to Flores, her inability to get out of bed or prepare her own food from December 17-20 would be sufficient to conclude she was substantially limited in a variety of major life activities. At the very least, viewed in the light most favorable to Flores, there is a dispute of fact regarding this requirement.

Flores' next required showing is that she was a "qualified individual with a disability." *Hutton*, 273 F.3d at 891. The "ADA explicitly defines a 'qualified individual' as 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1127 (9th Cir. 2020) (quoting 42 U.S.C. §

12111(8)).  While Flores had to miss some days of work, the record viewed in the light most favorable to Flores shows she could have been able to perform the essential functions of her position at DISH if she had been provided accommodations, such as leave.  *See* 42 U.S.C. § 12111(9) (accommodations may include "part-time or modified work schedules").

Flores' final preliminary showing is that she suffered an adverse employment action.  It is undisputed Flores's termination was an adverse employment action.  Thus, the record viewed in the light most favorable to Flores establishes she can establish her prima facie case.  DISH then offers Flores' excessive absenteeism as the legitimate non-discriminatory reason for her termination and argues Flores cannot establish that reason was pretextual.  (Doc. 48 at 12).  It appears, however, DISH has misunderstood how the ADA operates on this point.

Under Ninth Circuit law, when an employee is terminated because of absences attributable to a disability, that may be a sufficient "causal link" to support liability for termination "because of [the employee's] disability."  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001).  In other words, "where an employee demonstrates a causal link between the disability-produced conduct and the termination, a jury must be instructed that it may find that the employee was terminated on the impermissible basis of her disability."  *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1093 (9th Cir. 2007).  *See also Alamillo v. BNSF Ry. Co.*, 869 F.3d 916, 921 (9th Cir. 2017) (describing causal link as covering situation where "absenteeism was the direct result" of the disability); *Dark v. Curry Cty.*, 451 F.3d 1078, 1084 (9th Cir. 2006) (discharging employee based on "misconduct" of employee operating truck while knowing he might have seizure was not "legitimate, nondiscriminatory explanation").  Viewed in the light most favorable to Flores, DISH may have terminated Flores because of her "disability-produced conduct" of missing work.  *Gambini*, 486 F.3d at 1093.  DISH is not entitled to summary judgment on the ADA disparate treatment claim.

**ii.    ADA Failure to Accommodate**

- 24 -

The prima facie elements for a failure to accommodate claim are, ostensibly, the same as a disparate treatment claim. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012).[8] And the requirement of a legitimate nondiscriminatory reason and evidence of pretext are also the same. Here, the evidence regarding the failure to accommodate claim is the same as the disparate treatment claim and, therefore, DISH is not entitled to summary judgment on the failure to accommodate claim.

### iii.   ADA Retaliation

Pursuant to the ADA's anti-retaliation provision, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). To establish a prima facie case under this provision, Flores must point to evidence of "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003).

Starting with the protected activity requirement, a request for accommodations can qualify as a protected activity. *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004); *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) ("Pursuing one's rights under the ADA constitutes a protected activity."). Viewed in the light most favorable to Flores, a variety of Flores' statements in December could qualify as a request for accommodations. *See Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D.

---

[8] Imposing a requirement of an "adverse employment action" in a failure to accommodate claim appears questionable. Pursuant to the explicit terms of the ADA, an employer's failure to provide "reasonable accommodations" is an act of discrimination. 42 U.S.C. § 12112(b)(5)(A). Thus, an employer commits a prohibited act of discrimination when it denies "an available and reasonable accommodation." *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). There is no additional requirement that, for example, the employee be demoted or terminated. Such a requirement would be contrary to the explicit text of the ADA. *See Exby-Stolley v. Bd. of Cty. Commissioners*, 979 F.3d 784, 802 (10th Cir. 2020) (requiring an "adverse employment action" in a failure to accommodate claim "would have the effect of significantly restricting the scope of the ADA's reasonable-accommodation obligation"). The Ninth Circuit model jury instructions recognize as much by not mentioning an "adverse employment action" in setting forth the elements of a failure to accommodate claim. Ninth Circuit Model Jury Instruction 12.7.

Or. 1994) (noting the ADA "does not require the plaintiff to speak any magic words before he is subject to its protections").  For example, Flores alleges she told Brown in early December of her medical condition, in mid-December Flores told the attendance line of her medical condition, and Flores informed Brown and Angulo of her medical condition on December 21st.  Flores was terminated shortly after these statements, undoubtedly an adverse employment action.  And the close temporal proximity may be enough, at summary judgment, to establish a causal link.

DISH claims its attendance policy was a legitimate non-discriminatory reason and Flores cannot establish that reason was pretextual.  But as with the ADA disparate treatment claim, a link between the disability-produced conduct and the termination may be enough to establish pretext.  The parties have not addressed whether such a link is sufficient.  Accordingly, for present purposes, the Court need only rule that DISH has not carried its burden of establishing an entitlement to judgment as a matter of law on the ADA retaliation claim.  The Court notes, however, that claims brought under the ADA's anti-retaliation provision "are redressable only by equitable relief" and "no jury trial is available." *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1270 (9th Cir. 2009).  Given those limitations, it is unclear whether Flores' ADA retaliation claim is duplicative of her other claims for relief.

### III.    Defense Counsel's Filings

Defense counsel's summary judgment filings contained statements and legal positions that, on their face, do not appear to have been made in good faith.  In resolving the summary judgment motions the Court outlined some of the troublesome statements and arguments.  The Court will now list those statements and arguments, as well as others. These statements and legal positions may be sufficient for the imposition of sanctions under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, or both.  Defense counsel will be required to identify the factual or legal support establishing each statement and argument was made in good faith.

In developing their response, defense counsel must address that by seeking

1   summary judgment they were representing the factual record *viewed in the light most*

2   *favorable to Flores* supported their positions.  For example, defense counsel stated "Flores'

3   UTI did not incapacitate her in any way."  (Doc. 48 at 6).  By making this statement,

4   counsel must have concluded the record, viewed in the light most favorable to Flores,

5   contained no evidence Flores was incapacitated "in any way."  That unequivocal statement

6   raises significant questions whether it can be reconciled with Flores' deposition testimony.

7   Moreover, defense counsel was present for Flores' deposition, such that they must have

8   been aware of the information contained in the deposition but made false representations

9   despite such knowledge.

10          Accordingly,

11          **IT IS ORDERED** the Motion for Summary Judgment (Doc. 46) is **GRANTED**.

12          **IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 48) is

13   **GRANTED IN PART** and **DENIED IN PART**.

14          **IT IS FURTHER ORDERED** no later than **June 30, 2021**, the parties shall file a

15   joint statement setting forth whether Plaintiff should file a motion for summary judgment

16   on the remaining claims.

17          **IT IS FURTHER ORDERED** no later than **June 30, 2021**, defense counsel shall

18   file a statement of no more than seventeen pages establishing the good faith basis for the

19   factual statements and arguments listed in Exhibit A to this Order.  Defense counsel should

20   also address whether sanctions are appropriate under Federal Rule of Civil Procedure 11

21   or 28 U.S.C. § 1927.  No later than **July 14, 2021**, Plaintiff shall file a response of no more

22   than seventeen pages.  No later than **July 21, 2021**, defense counsel shall file a reply of no

23   more than eleven pages.

24          Dated this 16th day of June, 2021.

25

26

27                                         Honorable Roslyn O. Silver
                                           Senior United States District Judge

28

**EXHIBIT A**

| DISH's Statements | Possibly contrary law or factual portion of record |
|---|---|
| Flores has no evidence supporting any of her claims against DISH.  (Doc. 48 at 1). | The record contains sufficient evidence supporting Flores' claims such that Flores, not DISH, is entitled to summary judgment on the FMLA interference claim. |
| Here, Flores has no evidence establishing an FMLA interference claim.  (Doc. 48 at 5). | The record contains sufficient evidence supporting Flores' claims such that Flores, not DISH, is entitled to summary judgment on the FMLA interference claim. |
| She was not entitled to take FMLA leave, did not provide any notice of intent to take leave, and was never denied FMLA benefits.  (Doc. 48 at 5-6). | The record contains sufficient evidence supporting Flores' claims such that Flores, not DISH, is entitled to summary judgment on the FMLA interference claim. |
| Flores was not entitled to FMLA leave because she did not have a serious health condition.  (Doc. 48 at 6). | The limitations caused by Flores' apparent UTI were sufficient to qualify as a "serious health condition." |
| Flores' UTI did not incapacitate her in any way.  (Doc. 48 at 6). | Flores testified to significant limitations, such as being unable to get out of bed without help, unable to attend work due to pain, and unable to prepare her own food. (Doc. 49-2 at 38). |
| Flores concedes she was able to work and perform regular daily activities between December 13, 2018, when her UTI was diagnosed, and December 21, 208 [sic], when she was terminated.  (Doc. 48 at 6). | DISH does not cite a concession by Flores that she was able to "perform regular daily activities" during this time period.  Instead, Flores' deposition indicates she could only perform basic self-care activities and "nothing else."  Flores could not prepare her own food.  (Doc. 47-1 at 23). |
| While she chose not to report to work following her doctor's visit on December 17, 2018, she admits she was fully capable of working on that day and intended to report to work after her doctor's visit. (Doc. 48 at 7). | DISH does not cite an admission by Flores that "she was fully capable of working" on December 17th. |
| Similarly, during her days off between December 18-20, Flores was fully able to care for herself and perform her regular daily activities (SOF 27) and again reported to duty on December 21, 2018, | DISH does not cite evidence Flores was "fully able to care for herself and perform her regular daily activities" from December 18-20.  Instead, Flores deposition indicates she could only |

| | |
|---|---|
| ready and able to work her full shift.  (Doc. 48 at 7). | perform basic care activities and "nothing else."  (Doc. 47-1 at 23). |
| Flores even concedes she did not believe she needed any leave.  (Doc. 48 at 7). | The context of this statement appears to be that Flores did not believe she needed leave during the time she learned of a co-worker's situation and "the time of [Flores'] situation."   (Doc. 49-2 at 71).  That is, prior to when Flores became ill.  There is no indication Flores meant she believed she did not need leave at any point in December 2018.   In fact, during her deposition, Flores explained her claims were based on not being "given the option to – to take advantage of leave." (Doc. 47-1 at 20). |
| Her UTI, while inconvenient and even painful, was not a serious health condition under the FMLA. *See* 29 C.F.R. § 825.113(d) ("the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc. are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave").  (Doc. 48 at 7). | The crucial introductory phase of 29 C.F.R. § 825.113(d) was deleted. |
| Flores did not notify DISH, or provide information to DISH sufficient to reasonably apprise it, that FMLA leave might apply to any of Flores' absences.  (Doc. 48 at 7). | At the very least, Flores provided adequate notice to DISH supervisors on December 21st. |
| Flores contends she had back pain beginning in November 2018; however, she admits the pain was intermittent, admits, prior to her UTI diagnosis on December 13, 2018, she attributed her pain to a pulled muscle, and admits the pain did not affect her daily living until after her termination. SOF 19 and 45. | DISH does not cite any admission by Flores that the pain "did not affect her daily living until after her termination."  Flores' deposition testimony was that the pain rendered her unable to leave her bed and unable to prepare her own food.  (Doc. 47-1 at 24). |
| The pain never affected her ability to work and she never spoke to her coach Brandon Brown about it.  (Doc. 48 at 7). | Flores testified the pain was too much for her to work on December 14.  (Doc. 49-2 at 38).  Flores also testified that she spoke with Brown about her pain in December. |

| | (49-2 at 40). |
|---|---|
| Flores never gave any indication to anyone at DISH she needed or intended to use medical leave, and never told anyone at DISH she had any medical condition for which she may need leave. (Doc. 48 at 7-8). | At the very least, Flores provided notice to Brown and Angulo on December 21st that her medical condition was serious.  Flores also provided limited information to Brown regarding kidney pain.  (Doc. 49-2 at 40). |
| The little information Flores did provide was patently insufficient to inform DISH that the leave was the result of a qualifying medical condition.  (Doc. 48 at 8). | The information provided to Brown and Angulo was sufficient to lead Angulo to conclude Flores might be entitled to leave. |
| While a UTI may be a "physical impairment," Flores has presented no evidence that her UTI substantially limited a major life activity at any time prior to her termination.  (Doc. 48 at 9). | Flores testified she could not get out of bed without help, had to sit slowly, and was unable to prepare food. |
| Her UTI – the only condition she had prior to of [sic] her termination – she concedes, did not affect her ability to work, prevent her from caring for herself, or otherwise substantially affect any major life activity prior to her termination. SOF 19-28, and 45.  (Doc. 48 at 9) | There is no citation to a concession by Flores that her UTI "did not affect her ability to work."  She testified the pain on December 14 prevent her from working. (Doc. 49-2 at 38). |
| Because Flores was not substantially limited in performing any major life activities during the relevant time period, she was not disabled within the meaning of the ADA.  (Doc. 48 at 10) | Flores testified she could not get out of bed without help, had to sit slowly, and was unable to prepare food. |
| Prior to her termination, Flores had been diagnosed only with a UTI, which resolved through the use of antibiotics. SOF 21, 26 and 45.  She had shared with no one at DISH that she had a UTI.  At most, she shared that she had general "back pain," and shared with the attendance line that she was going in for "tests" because she had pain. SOF 25 and 37. Such facts were not sufficient to be reasonably interpreted as a disability. *See Alejandro*, 129 F. Supp. at 909 ("Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney.  Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |

| | |
|---|---|
| its obligations under the . . . ADA."). In the absence of any knowledge of Flores' purported disability, no decision by DISH could be based on or be made because of that purported disability. (Doc. 48 at 10-11 | |
| Here, Flores did not provide DISH any notice of her condition, gave no indication her condition caused in any limitations for which she needed an accommodation, and never sought any accommodation. (Doc. 48 at 12) | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Flores was terminated because she accrued the number of attendance points triggering termination under DISH's attendance policy; a legitimate, non-discriminatory reason for her termination. Flores has no evidence establishing any of her claims against DISH, or supporting any contention that its reason for her termination was pretext. (Doc. 48 at 15) | The record contains sufficient evidence supporting Flores' claims such that Flores, not DISH, is entitled to summary judgment. |
| DISH is entitled to summary judgment in this matter, and an award against Flores for its fees and costs. (Doc. 48 at 15). | DISH does not cite any authority authorizing an award of fees in these circumstances under the FMLA or ADA. Assuming DISH was referencing an award of fees under the ADA, such fees may be "awarded to a prevailing defendant only if the plaintiff's action was frivolous, unreasonable, or without foundation." *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1190 (9th Cir. 2001). There was no reasonable likelihood Flores' action would qualify as "frivolous, unreasonable, or without foundation." |
| Plaintiff has no evidence establishing the prima facie case for any of her claims against DISH. (Doc. 57 at 1) | The record contains sufficient evidence supporting Flores' claims such that Flores, not DISH, is entitled to summary judgment on the FMLA interference claim. |
| At the time of her termination Flores had a urinary tract infection ("UTI"), and nothing else, a condition that is neither a serious medical condition under the FMLA nor a disability under the ADA. (Doc. 57 at 1) | There is no cited authority establishing the FMLA adopts this "diagnosis-only" approach. |

| | |
|---|---|
| Even if her condition was a serious medical condition or disability (which it was not), Flores did not provide enough details to DISH for a reasonable person to recognize that she needed leave under the FMLA because of an inability to perform her job (29 U.S.C. § 2612(a)(1)(D)), or needed an accommodation under the ADA because such was necessary to perform the essential functions of her job.  (Doc. 57 at 1) | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney.  Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Equally clear is Flores fails to establish she was incapacitated "for more than three consecutive, full calendar days." (Doc. 57 at 4). | Flores' deposition established she was incapacitated from December 17-20. |
| She provides no medical records indicating she was or needed to be off work because of her UTI or associated symptoms before her termination. Flores' failure to point to evidence is fatal to her FMLA claim. *See Nagy v. W. All. Bank*, No. 2:16-CV-2095 JCM (GWF), 2018 U.S. Dist. LEXIS 104731, at *11 (D. Nev. June 22, 2018) (holding plaintiff not entitled to FMLA leave where plaintiff was unable to produce evidence of an inability to work for more than three calendar days); *Nelson v. Fiskars Brands*, No. 3:14-cv-00685-SB, 2015 U.S. Dist. LEXIS 124328, at *36 (D. Or. July 10, 2015) (holding similarly); *Carter v. Rental Unif. Serv. of Culpeper, Inc.*, 977 F. Supp. 753, 760 (W.D. Va. 1997) ("As a matter of law, an illness that incapacitates an individual for only ... the two-day period the doctor advised [the employee] to take off from work, is not covered by the FMLA."); *see also Schaar v. Lehigh Valley Health Servs. Inc.*, 598 F.3d 156 (3rd Cir. 2010) (holding that some medical evidence is necessary to show that the incapacitation was "due to" the serious health condition.); *Culpepper v. BlueCross BlueShield of Tenn.*, 321 Fed. Appx. 491, 496–97 (6th Cir. 2009) (holding that the plaintiff's "own | The authority DISH cites is contrary to *Marchisheck v. San Mateo County*, 199 F.3d 1068, 1071 (9th Cir. 1999).  Crucially, DISH cites *Schaar v. Lehigh Valley Health Servs. Inc.*, 598 F.3d 156 (3rd Cir. 2010) but that case explicitly notes the law is different in the Ninth Circuit. |

| | |
|---|---|
| subjective testimony that she was too sore from surgery to work" could not establish her absences were covered by the FMLA); *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 591 (7th Cir.2008) (holding that some medical evidence is necessary to establish a serious health condition); *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1194-95 (8th Cir. 2000) (affirming judgment as a matter of law against an employee who provided no medical evidence showing he was incapacitated for more than three days). (Doc. 57 at 4). | |
| Second, Flores' FMLA interference claim fails because she did not notify DISH she was or would be absent "under circumstances which indicate the FMLA might apply." *Bachelder*, 259 F.3d at 1130. To survive summary judgment, Flores must prove she provided information sufficient to reasonably apprise DISH that her absences were due to a serious health condition. *See Marquez v. Glendale Union High Sch. Dist.*, No. CV-16-03351-PHX-JAT, 2018 U.S. Dist. LEXIS 173343, at *71-72 (D. Ariz. Oct. 9, 2018) ("When an employee requests leave under the FMLA, the employer must be made aware that the absence is due to a serious illness so that the employer can distinguish it from ordinary sick-days."). To be sufficient under the FMLA, the notice must be substantively adequate, timely, and consistent with the employer's proscribed procedure. *See* 29 C.F.R. §§ 825.302 and 303. Flores' notice failed in all three respects. (Doc. 57 at 5) | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney.  Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Further, her presentation of medical records during her termination meeting did not substantively change the information DISH had.  (Doc. 57 at 6) | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney.  Angulo concluded, based on the information Flores |

| | |
|---|---|
| | provided, Flores might be entitled to leave. |
| The information Flores provided DISH, even with the benefit of the records, was substantively insufficient to reasonably put DISH on notice she suffered a serious health condition. (Doc. 57 at 6). | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Finally, even if the information Flores provided to DISH triggered its obligation to inquire further (which it did not), Flores would nevertheless have been terminated because her UTI was not a serious health condition under the FMLA. (Doc. 57 at 8) | There is no cited authority establishing the FMLA adopts this "diagnosis-only" approach. |
| Flores' ADA claims are based on the faulty premise that Flores' alleged disability or supposed need for accommodation were known to DISH. Even if she was disabled and needed an accommodation, which DISH contests as set forth in its Motion (Doc. 48), Flores has not established that DISH knew when it terminated her employment on December 21, 2018, she was disabled or about any limitations her alleged disability purportedly caused. (Doc. 57 at 8). | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| The only thing DISH knew when it terminated Flores was that she had been absent for two non-consecutive days, and, to the extent any condition limited her, that condition had not affected her ability to perform her job and Flores did not share how it affected her outside of work. Flores did not tell her supervisor or human resources any information from which a reasonable person could conclude she was disabled or in need of an accommodation. Nothing she shared during her termination process altered that knowledge other than putting a name to a condition – a urinary tract infection. No reasonable employer would conclude that two non-consecutive absences – even if related - meant that Flores was disabled or that she needed any | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |

| | |
|---|---|
| accommodation to perform her job. To the contrary, the known facts indicated Flores could fully perform her job, did perform her job, and was ready, willing, and able to continue doing so at the time of her termination. Doc. 49, SOF 19-28. Flores simply cannot establish that DISH knew of any alleged disability, or that, based on the limited information DISH had, Flores might need an accommodation.  (Doc. 57 at 9). | |
| Flores did not have a serious health condition during her DISH employment, and nothing in the information Flores shared with DISH about any condition she did have during her employment reasonably indicated that any of her absences were or should have been covered by the FMLA.  (Doc. 52 at 1) | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney.  Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Flores' self-serving testimony, standing alone, is insufficient to prove incapacity under the FMLA.  *See Nagy*, 2018 U.S. Dist. LEXIS 104731, at *11 (uncorroborated self-serving testimony not enough to establish inability to work for more than three calendar days); *Nelson v. Fiskars Brands*, No. 3:14-cv-00685-SB, 2015 U.S. Dist. LEXIS 124328, at *22-23 (D. Or. July 10, 2015); *see also Schaar v. Lehigh Valley Health Servs. Inc.*, 598 F.3d 156 (3rd Cir. 2010) (holding that some medical evidence is necessary to show that the incapacitation was "due to" the serious health condition.); *Culpepper v. BlueCross BlueShield of Tenn.*, 321 Fed.Appx. 491, 496–97 (6th Cir. 2009) (holding that the plaintiff's "own subjective testimony that she was too sore from surgery to work" was insufficient to establish that her absences were covered by the FMLA where her medical certification stated that she would need to be absent from work for two episodes of incapacity lasting three days | The authority DISH cites is contrary to *Marchisheck v. San Mateo County*, 199 F.3d 1068, 1071 (9th Cir. 1999).  Crucially, DISH cites *Schaar v. Lehigh Valley Health Servs. Inc.*, 598 F.3d 156 (3rd Cir. 2010) but that case explicitly notes the law is different in the Ninth Circuit. |

| | |
|---|---|
| each); *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 591 (7th Cir.2008) (holding that some medical evidence is necessary to establish a serious health condition ); *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1194-95 (8th Cir. 2000) (affirming judgment as a matter of law against employee who provided no medical evidence showing that he was incapacitated for more than three days). (Doc. 52 at 4) | |
| Flores' repeated attempt to cast her two pre-termination absences as occurring "in the midst of obtaining a life-changing and critical diagnosis," Flores' Motion at 2, is farcical. Flores had a UTI – which resolved after a course of antibiotics. Doc. 53, CSOF 58, 60, 68, and 69. After her termination, she developed a cyst and was hospitalized for an infection. Doc. 53, CSOF, 68-71. Medical conditions and hospitalizations that occurred after her termination do not retroactively bring her December 14 and 17 absences within FMLA coverage. (Doc. 52 at 5) | There is no cited authority that a diagnosis at a particular point in time must control. In particular, there is no authority establishing Flores' approach is "farcical." |
| Flores' FMLA interference claim also fails because she did not notify DISH that she was or would be absent "under circumstances which indicate the FMLA might apply." (Doc. 52 at 6) | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney.  Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| The information Flores provided DISH is far from the "abundant, repetitive, and fulsome" notice Flores claims. See Motion at 8. Rather, as Flores concedes, the only information Flores conveyed to DISH was that she was "ill," "sick," had "pain," and had been or was going to the doctor. *See* Motion at 9. Such vague references and generalized descriptions are insufficient as a matter of law.  (Doc. 52 at 6) | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney.  Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| DISH knew only that Flores was absent from work for two non-consecutive days – | On December 21st, Flores shared information with Brown and Angulo that |

| | |
|---|---|
| with no information reasonably adequate to indicate the absences were because of any illness or condition that might be covered by the FMLA. (Doc. 52 at 7). | she was experiencing significant pain connected with her kidney.   Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Flores makes much of her providing copies of her doctor's records evidencing her UTI diagnosis at her termination meeting on December 21, 2018. However, nothing in those records supports her contention that her UTI was a serious medical condition, or that she had been incapacitated for more than three days. The records do not explain why she was absent, do not indicate her UTI necessitated she be off work, and do not indicate she had been or would be unable to work or care for herself for more than three days because of her UTI. The records were insufficient to reasonably put DISH on notice that she suffered a serious health condition. (Doc. 52 at 8) | On   December   21st,   Flores   shared information with Brown and Angulo that she   was   experiencing   significant   pain connected   with   her   kidney.   Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| No reasonable juror could conclude Flores adequately notified DISH that she was or would   be   absent   under   circumstances indicating the FMLA might apply. (Doc. 52 at 8) | On   December   21st,   Flores   shared information with Brown and Angulo that she   was   experiencing   significant   pain connected   with   her   kidney.   Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Flores' Motion should be denied because she fails to establish a prima facie case of FMLA   interference.   During   her employment with DISH, Flores'   only medical condition was a UTI, which is not a serious health condition under the FMLA. Flores presents no evidence that she was incapacitated for more than three full calendar days and the only evidence that she   was   incapacitated at all during her employment is her self-serving declaration – which is unsupported and conflicts with her deposition testimony. Flores also fails to establish that she gave DISH adequate notice under the FMLA that either her December 14 or December 17 absences were or may have been covered by the | This includes a "diagnosis only" approach without citation to authority adopting such an approach.   This also ignores Flores' deposition   testimony   that   she   was incapacitated from December 17-20.  And this ignores the information conveyed on December 21st which was sufficient for Angulo   to   conclude   Flores   might   be entitled to leave. |

| | |
|---|---|
| FMLA. The only information Flores provided was vague generalities. No reasonable juror could conclude that the information Flores provided DISH was adequate notice under the FMLA. (Doc. 52 at 13) | |
| Plaintiff has no evidence establishing the *prima facie* case for any of her claims against DISH. At the time of her termination Flores had a urinary tract infection ("UTI"), and nothing else, a condition that is neither a serious medical condition under the FMLA nor a disability under the ADA. Even if her condition was a serious medical condition or disability (which it was not), Flores did not provide enough details to DISH for a reasonable person to recognize that she needed leave under the FMLA because of an inability to perform her job (29 U.S.C. § 2612(a)(1)(D)), or needed an accommodation under the ADA because such was necessary to perform the essential functions of her job. (42 U.S.C. § 12111(8-9); 29 C.F.R. §1630.1 (m)-(o)). (Doc. 57 at 1). | This includes a "diagnosis only" approach without citation to authority adopting such an approach. This also ignores Flores' deposition testimony that she was incapacitated from December 17-20. And this ignores the information conveyed on December 21st which was sufficient for Angulo to conclude Flores might be entitled to leave. |
| Whatever symptoms Flores may have had, those symptoms did not affect her ability to work, never bothered her enough that she felt like she needed to talk to her supervisor about it; and did not affect her ability to care for herself until after her termination. (Doc. 57 at 2). | DISH does not cite any evidence that Flores' pain "did not affect her ability to care for herself until after her termination." Flores' deposition testimony was that the pain rendered her unable to leave her bed and unable to prepare her own food. (Doc. 47-1 at 24). |
| Flores' failure to point to evidence is fatal to her FMLA claim. *See Nagy v. W. All. Bank*, No. 2:16-CV-2095 JCM (GWF), 2018 U.S. Dist. LEXIS 104731, at *11 (D. Nev. June 22, 2018) (holding plaintiff not entitled to FMLA leave where plaintiff was unable to produce evidence of an inability to work for more than three calendar days); *Nelson v. Fiskars Brands*, No. 3:14-cv-00685-SB, 2015 U.S. Dist. LEXIS 124328, | The authority DISH cites is contrary to *Marchisheck v. San Mateo County*, 199 F.3d 1068, 1071 (9th Cir. 1999). Crucially, DISH cites *Schaar v. Lehigh Valley Health Servs. Inc.*, 598 F.3d 156 (3rd Cir. 2010) but that case explicitly notes the law is different in the Ninth Circuit. |

| | |
|---|---|
| at *36 (D. Or. July 10, 2015) (holding similarly); *Carter v. Rental Unif. Serv. of Culpeper, Inc.*, 977 F. Supp. 753, 760 (W.D. Va. 1997) ("As a matter of law, an illness that incapacitates an individual for only ... the two-day period the doctor advised [the employee] to take off from work, is not covered by the FMLA."); *see also Schaar v. Lehigh Valley Health Servs. Inc.*, 598 F.3d 156 (3rd Cir. 2010) (holding that some medical evidence is necessary to show that the incapacitation was "due to" the serious health condition.); *Culpepper v. BlueCross BlueShield of Tenn.*, 321 Fed. Appx. 491, 496–97 (6th Cir. 2009) (holding that the plaintiff's "own subjective testimony that she was too sore from surgery to work" could not establish her absences were covered by the FMLA); *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 591 (7th Cir.2008) (holding that some medical evidence is necessary to establish a serious health condition); *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1194-95 (8th Cir. 2000) (affirming judgment as a matter of law against an employee who provided no medical evidence showing he was incapacitated for more than three days). (Doc. 57 at 4-5). | |
| Second, Flores' FMLA interference claim fails because she did not notify DISH she was or would be absent "under circumstances which indicate the FMLA might apply." (Doc. 57 at 5). | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Further, her presentation of medical records during her termination meeting did not substantively change the information DISH had. The records do not explain why Flores was absent, do not indicate her UTI necessitated she be off work at any time, and do not indicate she could not work or | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |

| | |
|---|---|
| care for herself for more than three days because of her condition. *See* Doc. 49-3, Exhibits F and G. The information Flores provided DISH, even with the benefit of the records, was substantively insufficient to reasonably put DISH on notice she suffered a serious health condition. (Doc. 57 at 6). | |
| Finally, even if the information Flores provided to DISH triggered its obligation to inquire further (which it did not), Flores would nevertheless have been terminated because her UTI was not a serious health condition under the FMLA. (Doc. 57 at 8). | This includes a "diagnosis only" approach without citation to authority adopting such an approach. This also ignores Flores' deposition testimony that she was incapacitated from December 17-20. And this ignores the information conveyed on December 21st which was sufficient for Angulo to conclude Flores might be entitled to leave. |
| Even if she was disabled and needed an accommodation, which DISH contests as set forth in its Motion (Doc. 48), Flores has not established that DISH knew when it terminated her employment on December 21, 2018, she was disabled or about any limitations her alleged disability purportedly caused. (Doc. 57 at 8). | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |
| Flores did not tell her supervisor or human resources any information from which a reasonable person could conclude she was disabled or in need of an accommodation. (Doc. 57 at 9). | On December 21st, Flores shared information with Brown and Angulo that she was experiencing significant pain connected with her kidney. Angulo concluded, based on the information Flores provided, Flores might be entitled to leave. |